May it please the court, Edward Himmelfarb for Secret Service Agents Tim Wood and Rob Savage. I'd like to thank the court for scheduling this argument to accommodate me. We start this, in our argument here, with this court's decision in the first appeal in Moss 1. At the end of Moss 1, the case went back to district court for the plaintiffs to replete. They repleted, and we're back up here now. And the question here on this appeal, at least from the federal defendant's point of view, is whether the plaintiffs, in their second amended complaint, have cured the deficiencies that this court found in the first amended complaint. And the answer to that question is no, and here's why. Let's start with the allegations with respect to the ProBush group. This court in Moss 1 pointed out that the plaintiffs had made a big point of how they were allegedly moved because their chants could be heard by the President on the outdoor patio restaurant. And yet, at the end of the game, when they had been moved, there was no allegation that the President could no longer hear them. And that's a critical point. This court in Moss 1 made that a critical point. And yet, when they went back to replete, they still have not pleaded that. The second amended complaint says nothing about whether they could be heard after they were moved, even down to past Fifth Street. And it does say they were no longer within the view of the President. It says nothing about being able to hear them or not. And this is significant because there is a question of relative distances. They're claiming that they were treated differently, adversely, because of their viewpoint, because they were moved farther away than the ProBush group. Now, we've explained in our brief about four or five different ways of looking at this issue. But let me try one more way of doing it here. In Moss 1, their allegation had been that they were moved, that the Secret Service agents ordered them moved past Fourth Street. At that point, if you look at the map in the complaint, they were approximately a quarter of a block from the alleyway where the outdoor restaurant was located. The ProBush group, on the other hand, was about three quarters of a block away. So at that point, when Moss 1 was decided, the allegations on which Moss 1 was decided, the plaintiffs were a half a block closer than the ProBush defendants. Well, first of all, when I look at this map and the fact that there are people spread out, so it's partly a question of which person you're looking at, the one closest or the one furthest. That's correct, Your Honor. If you're looking at the one closest, my understanding is that the one closest of the ProBush group was about a third of a block from the alley that led to the Jacksonville Inn, and that these people, when they were two blocks away, were about, you know, almost two blocks from the closest person. The closest person was almost two blocks from that same alley. Is that not right? That's actually, with all respect, Your Honor, that's not correct. If you look at the map in the Second Amendment complaint, you see that the ProBush group was approximately three quarters of a block from that alleyway. The plaintiffs, the anti-Bush group, initially across Fourth Street were approximately a quarter of a block, and that's why I was starting to say they were a half a block closer. When they were moved past Fifth Street, they were then a block and a quarter from the alleyway, which is a half a block farther. Now, the significance of that is this. In Moss 1, this Court said that being a half a block apart, it didn't say it quite in those words, but being moved past Fourth Street put them at a comparable distance to the ProBush group. Well, but now we have a new allegation, really, don't we? The first time it was alleged they were on the east side of Fourth Street, and now we find they're not only moved from the east side of Fourth Street to the east side of Fifth Street, correct? That's absolutely correct. And so, therefore, there is a change in the allegations of the complaint, yes? Yes, there is. And if there are changes in the allegation and complaint, and we're really talking about whether they are comparable or not, why is that summary judgment? Well, actually, we're not. Why is that a motion to dismiss? Why is that this kind of a thing? Why is that not something that the jury couldn't decide? Well, Your Honor, you get to the – well, I mean, there are a couple of answers to that. The first is that we already have this Court's decision in Moss 1. I think that changes everything. Well, you have a decision in Moss 1 that suggests that you should plead with more particularity what you are pleading. That's correct. That they should plead. Sorry, I didn't mean you. But now we have pleading about an east side of Fifth Street, which was different than the east side of Fourth Street. And now we're really trying to decide what's comparable and what isn't. That's correct. And is that really a court decision? It is. Your Honor. What case says that's a court decision? Well, this is – this is – I mean, what I'm really saying is we're going to say that we're the east side of Fifth Street, and you're going to admit that, and then you're going to say the facts are so straightforward that there is no way one could say that's not comparable. Isn't that what you've got to argue? What we're saying at this stage under Iqbal is that they have to allege a plausible claim of viewpoint discrimination. I understand. And based on Moss 1, half a block's distance between – relative distance of the two groups is comparable. I'm not saying half a block. But aside from that, there were several other differences in the pleadings, or several other considerations. One is that it seems unarguable that since the President left via Third Street, the ProBush people were much closer. In fact, they were directly in front of him when he left. When he left. And the other people were nowhere nearby. That's correct. And that doesn't matter? It does not matter, because what the plaintiffs are using that allegation for and what the district court and the magistrate judge used that allegation for was to show, allegedly, that the Secret Service agents were not actually doing their job of protecting the President. They were – that there were – But those are two things. One thing it shows is that at least one point in this whole set of events, there was a – no matter how you look at it, a major difference in whether one was directly next to the President and the other one was several blocks away. And secondly, it also – it's being used to show that the purported reason was a pretext because if you were trying to protect the President from people that you thought might shoot him, you wouldn't let anybody be that close to him when he was driving away. Why isn't this good for both purposes? I'm sorry? Why isn't this adequate for both purposes in terms of just showing enough to get by a motion to dismiss, which is all we're talking about? Right. But that's not what they're pushing this allegation for. Their allegation is – Well, I don't care what they're pushing it for. I'm looking at the complaint and what it actually demonstrates. Well, because what – the second point is relevant to the first also. The second is that when he left, he was inside a limousine. The reason they moved the people from the block was that he was outdoors at a restaurant. That's totally different from being inside a limousine driving through the streets. And what about all the people who were in the hotel that nobody bothered about? That's right. That's right. But they were – they were not in the same position because, as this Court said in Moss 1, they were not similarly situated. They had no viewpoint whatsoever. What difference does that make? They were not out in the public areas the way the plaintiffs were. The plaintiffs were right outside that alleyway when the President – They were closer. That's right. They were closer. The people who were in the hotel were closer. That's right. They were closer. And if you were worried about trying to protect somebody. That's right. Nobody knew – even the Secret Service agents didn't really know until the last minute that the President was changing his plans and coming to this restaurant. So when they – when they – when they showed up and saw people in the restaurant, they weren't so concerned about those people. They were concerned about other people who showed up later. But what – I'm sorry. I don't understand what you're saying. Because they – people in the restaurant had not anticipated the President would be there, so they were less concerned about those people. They were more concerned about the people who were out on the street in a large crowd of approximately 300 people who could possibly provide cover for people who wanted to do harm to the President. That's – that was the problem. That's why they moved all persons, not just the plaintiffs, the protesters. They moved all persons from the block in front of that alleyway. Did they know what the route, the motorcade route, was going to be when the President  I'm sorry. Did who know that? Is there any allegation – is there any allegation that your clients or that the State Patrol knew what the route of the President was going to be, that he was going to be going down 3rd Street? I don't think that's an allegation, Your Honor. I don't believe that's an allegation. Of course they knew. But in fact, that was – Because he was going to the Honeymoon Cottage, which was on 3rd Street. I'm sorry? They had to have known because where he was going was – from looking at the map, was on 3rd Street, to the Honeymoon Cottage. Well, they might have, but I don't believe that's in the complaint. We have a map. You can look at the map. The map shows that the – that he's going to the Honeymoon Cottage, which – and it shows that in order to get there, you go down 3rd Street. That was attached to the complaint. Yes. That's correct. So that's not good enough. No, I'm saying that that's the most likely way that he was going to go, but I don't believe that's an actual allegation in the complaint, that they knew – that they knew. But the point is, it would be an inference that the Court could fairly draw from this record. But that they knew that? That they were surmised that the President would have gone down 3rd Street, because that's where the – that's where the Honeymoon Cottage was. That's right. But that was not the reason for moving the plaintiffs away from – No. Did anybody ask for the protesters to be moved onto 3rd Street as well? Did – That's not in the record. That's not in the complaint. They were never consulted. They were just told, this is where you're going, and that was it. That's my understanding. That's what the complaint seems to allege, and that's my understanding of how things actually happened. It would be – it might be a different case if they had all asked to be – go over and mix with the pro-Bush group, but there's nothing in the complaint that says that they asked to do that. Did they get to ask anything? The complaint is, these people came and they – they claim, you know, fairly violently or at least emphatically pushed them away and didn't ask them anything. I think – I think that there was definitely some discussion there. This is not the way people operate, just moving – And all of this – where all of this seems to be going, to me at least, is where Judge Smith's suggestion, which is, you know, there's a – I understand that Iqbal to some degree has changed the degree to which we parse complaints, but has it changed to this degree? Absolutely. Yes. To the degree that when we have this degree of detail, which is a pretty great amount of detail, from which one could at least pretty plausibly surmise that this is at least one view, one possible understanding of what went on here. That we – instead of finding out what actually went on here, we're just going to throw the case out in the plaintiffs. Well, Your Honor, under Iqbal, we consider these allegations to be conclusory and they are not suggestive of a plausible claim. I would say one more important thing in this, which is that Iqbal is a Step 1 qualified immunity issue. There's a Step 2 qualified immunity issue here, too. Even if you assume that they've stated a plausible claim, these are Secret Service agents charged with the role of protecting the life of the President. And, you know, in considerations of like Hunter – those in Hunter v. Bryant, Supreme Court, you know, they're entitled to make reasonable mistakes of judgment. But it depends – but they're not entitled to make a reasonable mistake of judgment of doing this because – for a viewpoint discriminatory reason, right? Well, the – And that's the allegation. Yes. But there are two parts to a viewpoint discrimination claim. One is the viewpoint – the motive, and the other is the significant differential treatment. And what we're saying here is they have not alleged a significant differential treatment. And they haven't alleged one that a jury could conclude? No. And this should never get to a jury because of qualified immunity. These decisions should not wait until a jury. They should be decided by the court as soon as possible. Well, if you would, instead of bringing it up here, gone to summary judgment, you might have been able to cut it off at that point. But now we're, you know, going on for a couple more years about this, instead of simply getting some discovery done and then bringing your summary judgment qualified immunity. Yes. But, Your Honor, we're entitled to raise qualified immunity at the dismissal stage. I understand you're entitled to. I'm asking whether it was wise. I think it was wise. With all respect, Your Honor, I think it was very wise in light of this Court's decision in Moss 1, which is binding on the Court. And I think that the distinction – What is binding on the Court? We're dealing with a different complaint. It's not the same complaint. It's a different complaint. That's right. But there are no – what we've argued is there are no material differences in the allegations. Well – You start from the principles articulated in Moss 1. There are no material differences in – The worry that I have, I guess, is that I found in reading the complaint the first time and in reading the complaint the second time some differences. One of those differences was the place to which they moved the people. The second difference is that we all of a sudden have a lot more references to the presidential action manual in the second amended complaint. That was in the first, Your Honor. Well, there was some there, but there were more. It was heavily in the first. Well – We made a big point of that in the first appeal. Well, I understand that. But when I read and compare them together, they're not the same now. Yeah, but that wasn't good enough in the first appeal. I understand. And also that there were more examples of anti-government opinion that was suppressed during the Bush presidency. But, Your Honor, those – what they say and their allegations – Well, what we're really looking at – the reason I'm asking the question before you answer it, maybe you ought to know, is it seems to me that when we've got this case in front of us, we're really, first of all, looking at what kind of an allegation do the plaintiffs need to get to even get to first base? And it seems to me that adding the extra space, if you will, that they were moved, gets them maybe to first base. Then the government comes back with their idea of why they did it, and then it seems to me that the pretext, then, is the important part that I'm really looking at here. So if I'm looking at pretext, and I add the fact that they're not in the way the go stay, and I add to the fact that there's all this reference in the Presidential Action Manual and the examples of suppressing the anti-government opinion, don't I get to the fact that this is not a case for dismissal on pleadings, that we have pled something worthwhile here? We're not just talking about conclusory stuff. We're talking about evidence. I don't think so. With all respect, Your Honor, the examples, the 12 examples they give are, as they say, according to published reports. If I can interrupt, your co-counsel, I'm sure, wants to stand up. Okay. I'm sorry. I was just trying to answer the question. I understand that. But although we did give you more time, we didn't give you that much more time. So thank you very much. Thank you, Your Honor. We've seen you earlier today. Good afternoon, and may it please the Court. And, yes, and no knife fight demonstrations this time around. Cecil Renish-Smith, on behalf of the Oregon State Police Defendants, Ron Rooker and Eric Rodriguez. And we're switching gears a little now, because we're talking about the Fourth Amendment. And I'm wondering if you could comment on the fact that the State Department indicated a plausible claim for relief for a Fourth Amendment violation against Rooker and Rodriguez based on their supervisory status, because there's no dispute that they were not present at the demonstration. They didn't. They were not alleged to have been present. But you're saying that not only it's not just that there was an absence of an allegation they were present, you're saying that in the record there is affirmative concurred evidence that they were not present? Let me back up. And there is no allegation that they were present. But that's a little different from your affirmative statement that everybody agrees they were not. So I'm just curious what the record said to support that statement. There is one comment in the record where the district court asks if there was allegation of specific personal involvement. And let's see if I have a copy of it. I did earlier. Well, we don't need a secondhand response to that, because we can read the allegations themselves on that. Right. So I'm sorry. I don't know if in the record there was actually evidence given. At least the record, at least the complaint does not allege that they were present. And the complaint does not allege that they specifically were consulted on the decision of where these demonstrators should be located or relocated. Is that correct? Correct. And there is no allegation in the complaint that they were consulted about the degree of force that should be used to move demonstrators. Correct. Which basically leaves the training question. So the issue is, do you agree that there are circumstances in which a supervisory level person can be found personally liable, not vicariously liable, for inadequate training, and what more would have to be said to set that up? Yes, there are circumstances where a supervisor may be found directly liable for inadequate training, but the allegations in plaintiff's complaint don't go far enough to show that these particular supervisors should be held personally liable, because there's no allegations regarding the training whatsoever. Well, how are they supposed to know anything about the training? Well, that's a tricky question, because it kind of brings up the issue of isn't that what they find out in discovery, what the training was. But if ICBAL stands for anything, it stands for the fact that when it comes to supervisory liability, nothing goes without saying, and that you can't just use an incomplete pleading to open the door to get the discovery you might need to make your case. And, you know, whether that is a heightened pleading standard, and the court recognized that. So how do they get over the catch-22? Well. Let's just postulate that there was training, and the training was you do what the Secret Service tells you to do, and if they tell you to do something that you perceive to be for a political motivation, you do it anyhow, because they're the bosses. Right. Or when you're trying to move people, you use tear gas. And pepper spray and shove them and push them. What I would suggest is that if there were allegations in the pleadings of more than one instance of this type of force being used against protesters that were known by the supervisors to be peaceful protesters, and, again, there are no allegations. It says such inadequate and improper training are the custom and practice of defendants. Well, it says that, but that's simply a conclusion. So would you agree that if there's something wrong here, it's subject to amendment, that the problem here can be amended as the earlier one was? If the complaint is deficient, it is subject to amendment just as in Moss 1. I would simply suggest that at this point the complaint is deficient. If, for example, they were to allege that this happened, they wouldn't have to actually allege details about what kind of training these people were given? They could allege details about the kind of training they could give, or if that is not available to them, more than one single instance of excessive force used under these circumstances. I mean, right now all they have is a single instance in which state troopers are alleged to have used excessive force against the protesters, and based on that, the district court found that they must have been acting on orders because, as the subordinates follow what their supervisors say. But as I said earlier, if ICPAL stands for anything, it stands for the fact that for purposes of pleading supervisory liability, nothing goes without saying. You have to say more than just this happened to me, therefore it must have been the supervisor's fault. Is there any allegation that these two people were involved in training specifically? The allegation is that they were responsible for supervising and training. They were the heads of their division or the whole patrol in one case, but is there any allegation that they participated in the training or fashioned the training or had the last say on what the training should be or anything like that? There is no direct allegation. Maybe the training was allocated to someone else in the office and they didn't have anything to do with it. That's quite possible. There's no allegation. And the allegations are basically that they were responsible, they were the supervisors, and that as the supervisors. So that's just straight-up supervisor liability that's being alleged. Correct. And nothing more. Okay. Do you have more to say? Because your time is not up. I have no more to say unless the Court has any other questions. Okay. Thank you very much. Counsel. May it please the Court. Stephen Wilker for the Plaintiff's Appellees. And I'd be happy to focus on the sort of two separate issues here, as you've heard, and I'd be happy to take them whichever word of the Court would prefer. But if the Court doesn't have a preference, I'll start with Ms. Renish-Smith's argument. Okay. I want to be clear. We were here before on Moss 1 on the Federal defendants. We weren't here before on the State defendants. Right. There was no prior motion. There was a prior motion, but it wasn't addressed to this issue or to the adequacy of the pleading, and it wasn't addressed in the Ninth Circuit. And therefore, and when we did address it at the district court, the motion was, at least in this respect, denied. So we haven't had an opportunity to explore whether if there are defects in the pleading that we could correct them by amendment. Well, let me ask about that. The remand said give the parties a chance to replead, and that included the plaintiffs, didn't it? It included the plaintiffs and the State defendants. Right. Without question. It included everybody. It did. And every claim. And, in fact, you did do some repleading. We did, Your Honor. How many times, how many different complaints have you now filed in this case? Is this the third or the fourth? This is the third complaint. You filed an initial complaint, then you filed an amended complaint that went up and got remanded, and then a third complaint? So this is the third one or is this the fourth complaint? This is the third one, Your Honor. And let me back up. The original complaint was filed in July 2006. Now it's dropped. I mean, you changed that right off the bat, didn't you? There was an amendment, and this was prior to my involvement in the case, Your Honor. The First Amendment complaint was filed, I believe, September 27, 2006. I don't need all the dates. Your time is precious. But how many iterations of this complaint have been made on the claims against the State officials? This is the third complaint against all of the officials. The second one had very modest changes. When was the motion to dismiss by the State? Was that made originally and ruled on or not ruled on? As to the second complaint, how did that happen? Okay. As to the second complaint, there was no motion as to the initial complaint. There was then a First Amendment complaint filed a couple months after the initial complaint. A motion practice happened and was made in the fall of 2006. They were argued in May of 2007. And those motions And was there a motion on this issue on this? No, there was not. The motions the State filed were directed to the claims for prospective relief. Those motions were granted. So there was no motion, and therefore you had no opportunity to or no reason to be changing it. There was no specific motion related to the sufficiency of the allegations against these State acts. Right. Then there was an appeal to this Court right after that? There was an appeal by the Federal defendants on the qualified immunity ruling, and that was what was at issue in Moss 1. But it was only the Federal defendants. But the remand allowed you to replead, and you did replead. Yes, we did. And when you did replead, at that point you knew about Iqbal. We did, Your Honor. Yes. And so the whole purpose of the first remand was that, well, this is a change in the territory of pleading. That you can't make that argument for yourselves, because you knew the pleading requirements by the time you pled this time. We did, Your Honor. And we did what we believed the best we could. But as you identified it earlier, it is a catch-22 to a certain degree, which is we pled what we could plead based on the facts we had at hand. It is certainly possible. Well, I can't tell the Court that I would replead if given the opportunity, because I don't know the answer to the question as to whether I could gather more information if the Court believes that these pleadings are deficient. This is obviously not in the record. But is there this kind of information, i.e., who's responsible for training and what kind of training, could be available through an FOIA-like procedure? Is there such a thing in Oregon? Yes. Oregon does have a public records law, Your Honor, and there are opportunities to make public records requests to get some kinds of information. I don't know whether the – I don't know how the State would react, whether they would treat this as security-sensitive information or claim some other exemption, so I simply don't know how that process would play out. All right. Do you want to go to the other issue? Sure. I wanted to follow up on Mr. Himmelfarb's comments regarding – there were some questions regarding the allegations regarding the Honeymoon Cottage. There are specific allegations about the President's motorcade leaving to the Honeymoon Cottage. They're in paragraphs 55 and 56 of the Second Amended Complaint, where we allege those facts. And we allege that the pro-Bush demonstrators were left in place while the anti-Bush demonstrators were forcibly moved not just one, but two blocks away from the scene to the east of Fifth Street. And we learned that fact after the initial – after the First Amended Complaint was filed, because the Savage Declaration that was submitted by the Federal defendants included that fact. So that was a fact we were able to include because the Federal defendants, in fact, provided that information. That was not part of the initial pleading because we didn't know that fact. We now know that fact because they've told us that fact. But that fact is a material difference. There are other material differences between the First Amended Complaint and the Second Amended Complaint. This Court in Moss 1 gave us the opportunity to replead, to meet the factual allegation requirements that Iqbal and Twombly imposed. And we've made our best effort to do that. We've tried to plead context. The context is, as Judge Smith pointed out, the series of events that occurred particularly during the first four years of the Bush Administration and leading up to the election in 2004 of the stifling of dissent at appearances by the President. We included information regarding the advance manual. That advance manual, while it was available when we got to the appeal portion the first time, was not part of the – was not attached to the First Amended Complaint or made an exhibit thereto. The manual was obtained at the end of the original motion practice and attached to that. The other changes were – between the First and Second Complaint were the additional street area, the presence of other people at the hotel. What about the fact that – which may have been obvious from the map the first time, that in fact there were buildings and walls between the demonstrators and the President. Was that in the First Complaint or only the Second? There was a map in the First Complaint. The map was a – not a map drawn to scale, nor a map that accurately – fully accurately depicted the surroundings. One of the things we did in connection with the Second Amended Complaint to provide better and more detailed factual allegations was to provide a map to scale. It's also reproduced in our – our appeal brief in the Wood case, where we've reproduced that – that map, and it is to scale. It doesn't – because of the way – the size of the area, we weren't able to extend it all the way to the east of Fifth Street. But there is additional detail. And as Judge Smith pointed out, this is a motion to dismiss. We are here, and the Federal defendants are seeking to prevent us from even getting passed go. And we are seven years from the events in question. The protested issue occurred on October the 14th of 2004, seven years from this Friday. Yes, we have had a couple of complaints, and there was an initial – initial complaint and an amended complaint. We were here almost exactly three years ago on these – on this argument before this Court. And we are still not past the pleading stage. I don't think that – neither Iqbal nor Twombly purports to eliminate the rules of Federal procedure and the requirement for a short and plain statement. They do elucidate what it – what you need to say. We have done our very best to plead the factual content necessary to satisfy that. But it's not the time at which we have to prove our facts. And what Mr. Himelfarb and the Federal defendants have asked the Court to do is to evaluate and weigh evidence and to make determinations as to what's comparable and what's not. And what about their insistence that you haven't pled that the President couldn't hear you? Does that matter? I think that's a – one, I don't recall and I don't – Mr. Himelfarb may be correct that there is no specific allegation that he could not be heard once they were moved east of Fifth Street. But it is a reasonable inference from the allegation that they were moved that distance that it would be more difficult to hear them from that distance because of the distance. I guess it's hearing here. There's hearing noise and there's hearing substance. Yes, Your Honor. And that is a reasonable inference from the allegations that are in fact pled in the second amended complaint. How many protesters are we talking about? The group was alleged to be 200 to 300 strong. But including, as alleged in the second amended complaint, a multigenerational protest, kids, adults, older adults. And so not everybody is screaming as loud as – it's not 200 to 300 people all screaming at the same decibel level. The second point that the Federal defendants raised is that we haven't pointed to a case on all fours where a Secret Service agent has been held accountable for making a determination based on the viewpoint of the group he is – he or she has directed be moved. And we have pointed out in our brief and in our materials to the various cases that demonstrate that it's impermissible, it's axiomatic, that a government official cannot select one group for differential treatment simply based on the viewpoint of their speaker. But what he actually said today was he agrees that's true, but there still has to be differential treatment. Right. And we've just discussed why there's differential treatment. They were moved. They were moved. The other group was not. They were moved further. They were moved in a – they were forcibly removed from the scene. The other group was not. And they certainly weren't there at the time that the motorcade went by. And – I'm sorry? And they certainly weren't there at the time the motorcade went by. Exactly, Your Honor. Who decided where their original location was going to be, given that nobody knew he was going to die in there apparently until shortly before it occurred? I think the allegation is, and if I'm wrong about this, my understanding is that's where the protesters congregated in town, because that's the center of town. I don't know that there's a specific allegation of that fact in there. This was an allegation. But you don't think there was an allegation that in the first instance that any of these defendants or anybody made a specific decision where the protesters would be and where the pro-Bush people would be? There's an allegation that the only allegation as to the location of the protest is that the protesters – is that the leaders of the protests consulted with local authorities and were told to stay on the sidewalks. That they intended a protest and they would be in town and they would stay on the sidewalks. That's what the allegations of the complaint say. They don't talk about where the presidents were going to be. And everybody agrees. I think this is fair that everybody does agree that the President did change his plans. But it's what happened in response to that change of plans that demonstrates the falsity of the security rationale. Well, I'm just curious how it happened that the protesters decided to settle on California Street between 3rd and 4th and the pro-Bush people chose to settle on the opposite side of 3rd Street. I don't think we know the answer to that other than that it happened. Isn't there – it seemed like in the inferences that the one thing people did know is he had to go down 3rd Street to get to the Honeymoon Cottage. He did, although it's not clear – I don't know that it's clear what route he intended to take from the fairgrounds to get there. That is the main thoroughfare through town. And so the question is people assembled. The question is what happened once they were assembled and where would the President be. I don't think we know the answer to that question. What we do know is that in response to that change in plans, the Secret Service agents here directed that action be taken for the purpose of discriminating against the viewpoint of these protesters. This is a suit. There is no prospective relief left in this case, right? There is no prospective relief. If it's a suit for damages, probably nominal damages at this point. There were more than nominal for at least some of the plaintiffs who were injured. There were some pepper spray injuries. But if we were talking just about the Secret Service people? It would probably be a form of nominal damage against the Federal defendants as I think about it here. But there may be other forms of damage available for the violation of the right to assemble. But I don't expect it would be a – it's not as if somebody had their head beaten in. So you're suing this, then, is it for the attorney's fees out of it? Is that the point? No, Your Honor. It's for the – it's to establish the principle and to establish law that the Secret Service agent cannot – Secret Service agents cannot make these kinds of decisions based on the viewpoints of the speakers in the groups they seek to move. And this is part of a – frankly, it's part of a pattern that we've seen around the country, at least saw around the country. And this is part of our effort and part of the plaintiffs' effort to vindicate their constitutional rights, just like any other constitutional case where there aren't significant dollar damages. I suppose it's also true that even if you can't breach the Fourth Amendment issues because of the way it's been pledged – are there other defendants on the – State defendants with regard to the Fourth Amendment issues? There are county defendants and city defendants. Oh, there are. And the city defendants are – and I don't – and there are State law claims against the city defendants, I believe, as well. So the appeal is only from the supervisors with regard to the Fourth Amendment issues, but there are other Fourth Amendment claims against other people? Yes, there are. And there are – and the remaining claims have been stayed by the district court pending this appeal. So we haven't – The other defendants are also facing U.S. Constitutional Fourth Amendment claims or are they facing only State claims? They are – I believe the – and I apologize, but I believe the county defendants remain – have Fourth Amendment claims pending that remain against them. I don't recall right now, Your Honor, whether the city defendants as well, because it wasn't part of what I considered in preparing for this argument. If I could, I'd like to go back to the second prong, and I want to think carefully about what counsel said as to what needed to be proved on the second prong. But it seems to me that the question you've asked in your briefs is government officials cannot discriminate against speech to refrain opposing viewpoints. It seems that the government argues in their briefs that a reasonable officer must have known that moving the protesters a block farther away from the pro-Bush protesters violated clearly established law. That's just a matter of a right question case, isn't it? It is and it isn't, but I don't think that's the right question. Well, I understood what you wanted to have the right question. But I guess I've looked at your cases, and it seems to me one can come off pretty well that one cannot discriminate against speech to refrain from opposing viewpoints, but that's just a general theory. That's not any case that would necessarily come to this case. What's your best case that you say I should rely on in the second prong? Because I looked at all the cases that you have cited in your briefs, and I'll be I think it's fair to say that there is no case on all fours here. Well, we're not talking even a case on all fours. I don't find any case in the literature which would even deal with how one deals in these situations where there's a protest. Well, when there's a protest and you select one group for different treatment than another, that, based on the viewpoint of the speaker, because that's the assumption in this prong of the test. I understand what the assumption is. The assumption is we've Have you seen there's a recent case in this circuit that I happen to have written called Hoy about some abortion protests which dealt directly with the question of whether you could have a differential enforcement policy depending on which side of the issue people were on? I'm sorry. H-O-Y-E was the name of the case. I'm trying to recall the case. I guess my worry is, I've seen Hoy, so I wanted to see how you were going to use Hoy. But the bottom line is, if I look at Menotti and I look what the government did in that particular matter, and I look at Long Beach Area Peace Network, where we look about the heightened interest in protecting the President, and I looked at Hunter v. Bryant, which is a Supreme Court case that gives ample room for mistaken judgments in protecting all but the plainly incompetent, it seems to me to have a tough time coming up with general cases about discriminating against speech to refrain opposing viewpoints. We have cited, Your Honor, at pages 26 to 30 of our brief, a number of cases involving speech-directed presidential and vice-presidential candidates, where the courts have come down squarely against any restriction based on the viewpoint expressed in the message. And that's what we're talking about here. We're talking about where one group of protesters has been selected, not for a security rationale, but because of the message. The assumption at which we're dealing at this stage of the case, if we're dealing with prong two, is that the decision was made because of their viewpoint, of the viewpoint of the protesters, not because of any purported security concern. And while we – while I understand we give leeway, simply uttering that this presidential security is at issue doesn't eliminate the First Amendment analysis, and it doesn't eliminate the clear prescription under Rosenberger and under the – under these other cases that have clearly held that government can't choose the message. What should they have done? What should the police have done, or either the State Patrol or the – or the security, once they concluded that there was an awful lot of people being massed right outside the restaurant area? What do you think they should have done? Let's say that they made a reasonable decision. That's too many people, too close. Hypothetically, if they had – If they had gone ahead and had a democratic vote from everybody as to where they wanted to go? No. But if they had made the determination that there was a security threat, they should have either prevailed upon the President not to dine at the end – He showed up, and they say, oh, my golly, there's a whole lot more people here than we thought, and they're right outside, they're right on his street, we don't feel comfortable, we've got to move. What should they have done? Well, then they should have moved the pro-Bush demonstrators a block west, further west, at least, and if they had done that, then it would have arguably been a basis to move the anti-Bush protesters a block east. But they didn't do that. They moved our plaintiffs two blocks to the east and then surrounded them, and they left the pro-Bush protesters all by themselves. And they didn't screen any of the diners or other guests or other individuals in the end. But in law of the case, our prior panel on this was pretty unimpressed with the differential with the guests within the group. Because they – and we don't know why they did what they did. Mr. Himmelfarb focuses on that issue in his brief. But law of the case is not an inflexible rule, and where it's not apparent that the Court considered the rationale for which we offered that evidence or that allegation, because we're not at the evidentiary stage, I think it's appropriate for this Court to consider the basis on which the district court relied on it in the – on the second go around. And in that case, as the district court correctly concluded, the – the rationale that the – that it's offered – that the – excuse me – that the allegation is offered to demonstrate the falsity of the security rationale, because if there's truly a security rationale based on proximity, they left alone the group's closest, absolutely closest to the President, and they moved to – they moved – the only group they moved was a group that was the closest, presented a lower risk profile. Why is that? Because they didn't apparently exhibit a viewpoint. It could have been hostile to the President. There's no evidence, and there's no evidence in the government – the government hasn't offered the rationale that – that the viewpoint expressed is a permissible basis to act, and that the – that the government hasn't offered here and hasn't argued that the fact that these were – these protesters were opposed to the President gave them a reason to move these protesters. In fact, they've denied that. Okay. That's not a rational basis on which to – listen, it's not a constitutionally acceptable basis on which to move these protesters. Do either of my colleagues have any more questions? Okay. Thank you very much. I think you're out of time. Is that right? Okay. Thank you very much. The case of Moss v. Wood is submitted. We are in recess, and thank you both all very much for an interesting argument and an interesting case.
judges: Ebel, Berzon, Smith